# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CHRISTINE EVANS o/b/o Andrea Evans,**

**Plaintiff,**

-vs-                                        **Case No.  6:04-cv-1654-Orl-JGG**

**COMMISSIONER OF SOCIAL
SECURITY,**

_____

## MEMORANDUM OF DECISION

On behalf of her daughter, Andrea M. Evans ["Andrea"], plaintiff Christine Evans ["Evans"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for Supplemental Security Income ["SSI"].  R. 12.  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

On August 24, 2001, Evans protectively filed an application for SSI on behalf of her daughter, Andrea.  The application was denied initially and upon reconsideration and a request for hearing was timely filed.

On June 18,2003, the Honorable Arthur W. Stacey, Administrative Law Judge ["ALJ"], held a 35 minute hearing at which Andrea and Evans testified. R. 353 -79.  The ALJ issued an unfavorable decision on September 23, 2003.   R. 12-24.  The ALJ found that Andrea has Attention Deficit Hyperactivity Disorder ("ADHD") and bipolar affective disorder, which constitute severe

impairments, but which do not meet, medically equal or functionally equal the criteria of the listings. R. 23-24.  Andrea, therefore, was found not to be disabled.  R. 24, Finding 7.

Evans requested review of the ALJ's decision on November 21, 2003.  R. 11.  Evans submitted additional evidence, which was accepted by the Appeals Council ["AC"].  R. 8; 377-79.  On September 10, 2004, the AC concluded that there was no basis to overturn the ALJ's decision.  R. 5-7.

On November 10, 2004, Evans timely appealed the final decision to the United States District Court.  Docket No. 1 at 1.  On July 7, 2005, Evans filed in this Court a memorandum of law in support of her appeal.  Docket No. 19.  On September 6, 2005, the Commissioner filed a memorandum in support of her decision that Andrea was not disabled.  Docket No. 20.  The appeal is ripe for determination.

## II.    THE PARTIES' POSITIONS

Evans argues that the Commissioner's decision that Andrea had no marked limitations in any of the functional domains was unsupported by substantial evidence.  The Commissioner counters that substantial evidence supports the ALJ's decision that Andrea was not disabled.

## III.    THE STANDARD OF REVIEW

### A.    Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*

*v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42. U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and enter an order awarding disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes

disability without any doubt.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the

district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

---

[1] The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.*

IV.   **THE LAW**

A.   **The Statute and the Regulations**

On August 22, 1996, the President signed into law the Personal Responsibility and Work Opportunity Reconciliation Act, Pub.L. No. 104-193, 110 Stat. 2105.   The Act amended the substantive standard for evaluating children's disability claims to read as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, **which results in marked and severe functional limitations**, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c (a)(3)(C)(codification of the Act)(emphasis supplied).   A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c (a)(3)(D).   The statute does not define "marked and severe functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments.   42 U.S.C. § 1382c (a)(3)(G).   In making any determination as to the disability of a child, the Commissioner must also make reasonable efforts to ensure an evaluation by a qualified pediatrician or other specialist in a field of medicine appropriate to the child's disability.   42 U.S.C. § 1382c (a)(3)(I).   With respect to a child with mental impairments, however, Congress has specified that the Commissioner must make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable RFC assessment.   42 U.S.C. § 421 (h).

Under express statutory authority, 42 U.S.C. § 405 (a), the Commissioner promulgates regulations governing eligibility for SSI benefits. 20 C.F.R. Part 416, Subpart I; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).  The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets, medically equals, or functionally equals the listings" in the Listing of Impairments in appendix 1 of subpart P of part 404.  20 C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.[2]  The regulations set forth the steps used in determining disability for children.  20 C.F.R. § 416.924 states :

> We follow a set order to determine whether you are disabled.  If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings.  If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled.  If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924 (a).

The Commissioner applies a three-part test in determining a child's disability.  The first determination is whether the child is working and performing substantial gainful activity.  20 C.F.R. § 416.924 (b).  If the child is not working, the Commissioner determines whether the child suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.924 (c).  If the child suffers from a severe impairment or combination of impairments, the Commissioner then determines whether the child's impairments meet, medically equal, or functionally equal an impairment listed in

---

[2]Part B provides medical criteria applicable to children in those instances in which Part A does not give appropriate consideration to the particular disease process in childhood.  *See* Parts A and B, Part 404, Subpart P, App. 1.

the listings. 20 C.F.R. § 416.924 (d). The Commissioner evaluates age, functioning, and other factors in determining whether a child meets a listing. 20 C.F.R. §§ 416.924a - 416.924b. Provisions for medical equivalence are established in 20 C.F.R. § 416.926.

Provisions for functional equivalence are established in 20 C.F.R. § 416.926a. Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning. 20 C.F.R. § 416.926a (a). There are six areas of functioning to be considered: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and, health and physical well-being. 20 C.F.R. § 416.926a (b)(1).

### B.     The Evaluation of Mental Disorders

The structure of the mental disorders listings for children under age 19 parallel the structure of the mental disorders listings for adults, but it is modified to reflect the presentation of mental disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation applicable to children. The listing for mental disorders in children are arranged in eleven diagnostic categories, including attention deficit hyperactivity disorder (112.11). 20 C.F.R. Pt. 404, Subpt. P, App. 1. A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for

mental disorders (motor function, cognitive/communicative function, social function; personal function, and concentration, persistence, or pace). 20 C.F.R. Pt.404, Subpt. P, App. 1. In most functional areas, there are two alternative methods of documenting the required level of severity: 1.) use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other medical findings. *Id.* The use of standardized tests is the preferred method of documentation if such tests are available. *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the child's motor, personal, social, cognitive/communicative functioning, and concentration, persistence and pace. This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases, descriptions of the child's activities of daily living or social functioning given by

individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Children with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such children may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these children's sustained ability to function. It is, therefore, vital to review all pertinent information relative to the child's condition, especially at times of increased stress. 20 C.F.R. Pt. 404,

-10-

Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the child either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in children with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

The Listing for Attention Deficit Hyperactivity Disorder, 20 C.F.R. § Pt. 404, Subpt. P. App. 1, § 112.11, requires:

A.   Medically documented findings of all three of the following:

    1.   Marked inattention; and
    2.   Marked impulsiveness; and
    3.   Marked hyperactivity;

-11-

AND

B.    . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P. App.1, § 112.11. For children (age 3 to attainment of age 18), Paragraph

B2 of 112.02 requires at least two of the following:

a.    Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b.    Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c.    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d.    Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P,  App. 1, § 112.02 B. 2.

C.    **Treating Physicians**

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Comm'r of Social Security*,  955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating

physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20

-13-

C.F.R. § 404.1527 (e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

### D.    Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### E.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether

the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### F.   Credibility

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the

-15-

implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V.   APPLICATION AND ANALYSIS

### A.   The Facts

Andrea was born on August 26, 1992 (R. 32), and was ten years old at the time of the hearing.

On April 1, 1999, Andrea's school issued a report that revealed that, while Andrea was in first grade, she was reading at a second grade level.  R. 79.  Nevertheless, the report further noted that Andrea continued to fail Scholastic Tests and to perform poorly on reading comprehension activities. *Id*.  The report also related concerns about Andrea's behavior, dishonesty and stealing.  *Id*.  Still, Andrea had no absences, and was reported as "doing well in the classroom."  *Id.*

Dr. G. Srinivasan saw Andrea on February 23, 2000.  R. 199.  Subjectively, it was reported that Andrea was becoming very defiant, sarcastic and would slam the door.  *Id*.  Consequently, her Adderall was increased, but that resulted in her doing worse.  *Id*.  Dr. Srinivasan, therefore, decreased the Adderall only to be given at school.  *Id*.  Dr. Srinivasan's impression was ADHD,  impending mood or perhaps conduct disorder.  *Id*.  Evans contacted Dr. Srinivasan's office on March 14, 2000, with concerns about Andrea's verbal abuse towards her.  R. 196.  Evans was advised that as long as Andrea's behavior did not become physically abusive, Evans should try to allow the second medication became active. *Id*.

An MRI of the brain dated May 16, 2000, was normal. R. 194.  Dr. Srinivasan saw Andrea on May 24, 2000.  R. 191.  Dr. Welch diagnosed Andrea with ADHD combined type and switched her

medicine to Long Acting Metadate, a form of Ritalin. *Id.* Andrea was to follow up with Debra Davis, ARNP for medical management, and Dr. Wharry for psychotherapy. *Id.* R. 191.

Claimant's report card from the third grade shows she made a "C" in Reading, a "B" in Language Arts, a "C" in Math, a "C" in Science/Health, a "C" in Social Studies, a "B" in Art, and an "A" in Music and Physical Education. R. 110. According to Claimant's report card, a "C" represents average progress, and a "B" represents above average progress. *Id.*

On June 1 , 2000, Dr. Srinivasan noted that Andrea was on Ritalin and Trazodone. R. 187. Andrea has stabilized on the Ritalin and is doing much better. *Id.* Alyn Benezette, D.O., prepared an electroencephalography (EEG) report on June 27, 2000. R. 186. The results of Andrea's EEG were normal. *Id.*

On September 20, 2000, Andrea returned to Dr. Srinivasan due to her ADHD conduct disorder, and Atarax was added. R. 183. On January 26, 2001, Andrea returned for medication adjustment and was placed on Concerta. R. 182. Evans called Andrea's doctor on February 14, 2001, to report that Andrea was very hyperactive. R. 181. Andrea's Concerta medication was increased. *Id.* At an examination on February 20, 2001, Dr. Srinivasan noted that Andrea was doing well. *Id.* On March 1, 2001, Evans reported that two tablets of Concerta was too much as Andrea was becoming aggressive. *Id.* Andrea's dosage was decreased to one tablet. *Id.*

In August 2001, Evans mother reported Andrea was able to speak and did not have problems with communication. R. 92-94. Andrea could read capital and small letters, and simple words; print, write in long-hand; spell most 3-4 letter words; add and subtract numbers over 10, make correct change, and tell time. R. 95.

Andrea was admitted to Halifax Medical Center on August 21, 2001.  R. 146.  The admitting

diagnosis was bipolar affective disorder, depression and ADHD by history.  *Id*.  Her Global

Assessment of Functioning ["GAF"] score was 40.[3]  *Id*.  Andrea was admitted because of increasing

aggressive and violent behavior towards siblings and other family members.  *Id*.  When Evans did not

allow Andrea to visit a friend, Andrea took it upon herself to take a different school bus and went to

the friend's house anyway.  *Id*.  The mental status examination revealed that Andrea frequently burst

into tears when discussing her relationship with her mother and her mother's boyfriend. R. 147. There

was, however, no overt anger or hostility, and no bizarre behavior or mannerisms.  *Id*.  Speech was

coherent and appropriate; affect was appropriate and labile, alternately depressed.  *Id.*  Andrea's

thought processes did not reveal any looseness of associations, no frank delusions, no hallucinations.

*Id.*  Andrea denied active suicidal, homicidal ideations or intent.  *Id.*  Cognitively, she was alert and

oriented to time, place, person and situation, and her memory was immediate.  *Id.*  Upon admission,

Andrea was placed on Wellbutrin, Depakote and Concerta. *Id.*  She was discharged on August 28,

2001, with instructions to have individual and family therapy at Halifax Psychiatric Services.  R. 146,

148.

Andrea was seen at Halifax Child and Adolescent Psychiatric Services on September 20,

2001.  R. 167.  Her problems included mood swings, defiance, school opposition, family conflicts and

aggressiveness to others.  *Id.*  The goal was to improve family relationships and parenting, stabilize

---

[3]The Global Assessment of Functioning ["GAF"] Scale describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations.  DSM-IV at 32.  A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job).  DSM-IV at 32.  A GAF code of 31 to 40 is worse — the individual has some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  DSM-IV at 32.

mood, improve coping skills, increase cooperative behavior and increase expression of feelings. *Id.*

Wendy Welch, M.D. summarized Andrea's treatment in a letter dated October 11, 2001. R. 171. Andrea was initially evaluated in the Mental Health Department on January 15, 1999, and her most recent visit was May 24, 2000. *Id.* Her diagnoses were ADHD, combined type and oppositional behavior. *Id*.

On October 15, 2001, Tonia Meyer, Andrea's fourth grade teacher completed a questionnaire after having known Andrea for three months. R. 53-58. Meyer noted that Andrea was unproductive, but had the capability of being a great student. R. 53. Andrea was described as being very social and likes to talk to those around her a lot. R. 56. She does not stay on task and needs to be reminded to get back to task about three times per hour. R. 57. Her response is sometimes "ok" and sometimes very defiant. *Id*. About half the time, Andrea did not complete her assignments because of her inability to remain on task. *Id*.

Adly Thebaud. M.D. evaluated Andrea on November 30, 2001. R. 209-17. She was seen due to constant problems at home and school. Dr. Thebaud diagnosed her as having bipolar disorder not otherwise specified and a GAF score of 50. R. 217. Andrea's Depakote was increased, the Wellbutrin continued and Risperdal was added. *Id*.

Andrea was admitted to Halifax Medical Center on December 3, 2001, due to acting out behavior, breaking into neighbor's homes, participating in the recent plan of a peer to spray chemicals on children, and writing sexual notes to male classmates. R. 287. At the time of admission, the diagnosis was bipolar affective disorder, hypomanic phase; and her GAF score was 40. *Id*. During the examination, Andrea was hyperverbal and over-elaborate. R. 288. During her hospital stay,

Andrea gradually stabilized.  *Id*.  Andrea was not sexually inappropriate, she approached baseline and overall was doing well.  *Id*.  She was discharged on December 9, 2001, with a GAF score of 65.  R. 287.

On January 9, 2002, Andrea was seen by Dr. Thebaud for medication management. R. 343. She was doing okay on her current dosage of Seroquel, Wellbutrin and Depakote.  *Id*.  Evans reported however that recently Andrea had some episodes of irritability, anger and low frustration tolerance.  *Id*.  Her Seroquel was increased and she was to begin therapeutic counseling. *Id.*

On March 6, 2002, Patricia Boger, Ph.D. completed a Childhood Disability Evaluation Form in which Andrea's bipolar disorder was found to be severe, but did not meet, medically equal, or functionally equal the listings.  R. 218-19.   Dr. Boger found Andrea had marked limitations in one area (attending and completing tasks), but that Andrea was not limited or less than markedly limited in all other areas. R. 220-21.  The basis for Dr. Boger's finding of marked limitation in attending and completing tasks was that Andrea only completed 50% of her work.  R. 220.

Andrea returned to Dr. Thebaud on March 12, 2002, and her mother reported that her current medications were not working as Andrea was still hyperactive, argumentative and had low frustration tolerances.  R. 340 - 41.  On April 9, 2002, improvement was noted in Andrea's condition.  R. 339. Her concentration had improved, she was less irritable, and grades and behavior are good at school. *Id*.  Her GAF score was 62.  *Id*.

 Andrea made "Bs" and "Cs" in the fourth grade during the 2001-02 school year, but was held back because of low test scores and problems completing her work.  R. 112, 117-18.

On May 8, 2002, Andrea reported that she was doing well with the medication and school was very much improved. R. 338. Andrea returned on June 12, 2002. R. 337. Again, it was reported that she was doing well on her medications and her GAF score was 65. *Id*.

Treatment notes from August 5, 2002, through July 21, 2003, reveal that Andrea treated with Dr. Thebaud for her mental condition. R. 325-36. Overall, Andrea did well on her medications during this time period and her GAF scores ranged between 60 and 65. *Id*.

In repeating the 4th grade, Andrea completed her class work, her homework, and was on the honor role for the last two semesters. R. 358, 377. Andrea also testified that she was able to care for her personal hygiene, to eat by herself, and to cross the street safely. R. 362. Andrea also testified to a number of activities that she participates in – spending the night with friends, going shopping, playing computer games and riding her bicycle. R. 358-59. Evans testified that Andrea can focus and complete tasks when she is on her medication, and that she has been functioning well for the last year. R. 365-67. She also is not harmful to herself when she is medicated. R. 368. Evans attributes Andrea's improvement to Andrea's teacher. R. 369.

### B.      The Analysis

Evans argues that the Commissioner's decision that Andrea had no marked limitations in any of the functional domains was unsupported by substantial evidence. Evans states in a conclusory fashion that because "Andrea has marked limitations in at least two domains or an extreme limitation in at least one domain, the ALJ erred by not finding her disabled." Docket No. 19 at 7-8. Evans does not identify in what domain Andrea has an extreme limitation. The Commissioner counters that substantial evidence supports the ALJ's decision that Andrea was not disabled.

1.    **Substantial Evidence Supports the ALJ's Decision that Andrea Was Not Limited in the Domain of "Acquiring and Using Information**"

Evans argues that substantial evidence does not support the ALJ's finding that Andrea had no limitation in the domain of "acquiring and using information." Evans points to Andrea's below average scores on the Florida Comprehensive Assessment Test ["FCAT"],[4] her below average score on the Kaufman Brief Intelligence test, her failing the Scholastic testing, and her retention in fourth grade due to low math and reading scores. Evans then leaps to the conclusion that these facts support a finding of either marked or extreme limitation. Docket 19 at 7-8.

The domain of "acquiring and using information" evaluates how well a claimant acquires or learns information, and how well she uses the information she has learned. 20 C.F.R. § 416.926a (g). The regulations pertaining to this domain state that school age children (age 6 to attainment of age 12):

> . . . should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; e.g., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. § 416.926a(g)(2)(iv). Some examples of limited functioning in acquiring and using information are:

> (i)    You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.

---

[4] The FCAT measures reading comprehension and mathematical problem solving. R. 67.

-22-

     (ii)     You cannot rhyme words or the sounds in words.

     (iii)    You have difficulty recalling important things you learned in school yesterday.

     (iv)    You have difficulty solving mathematics questions or computing arithmetic answers.

     (v)     You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. § 416.926a (g)(3).

In this case, there was no evidence that Andrea had limitations such as those described above. Based on the record of the hearing, Andrea appeared to have no difficulty understanding questions, recalling school events, or speaking.  School records show that, even though Andrea scored poorly on scholastic tests, Andrea was able to read at a second grade level when while still in the first grade. R. 79.  Further, Andrea's report card from the third grade shows she made a "C" in Reading, a "B" in Language Arts, a "C" in Math, a "C" in Science/Health, a "C" in Social Studies, a "B" in Art, and an "A" in Music and Physical Education.  R. 110.  According to Andrea's report card, a "C" represents average progress, and a "B" represents above average progress.

In August 2001, Evans reported that Andrea was able to speak and did not have problems with communication.  R. 92-94.  Andrea could read capital and small letters, and simple words; print, write in long-hand; spell most 3-4 letter words; add and subtract numbers over 10, make correct change, and tell time.  R. 95.  Claimant made "Bs" and "Cs" in the fourth grade, during the 2001-02 school year, but was held back because of low test scores and problems completing her work.  R. 112, 117-18.

In June 2003, Evans mother reported that Andrea had been doing well on her medications for the past year.  R. 366.  With medication, Andrea was able to complete household chores, get along with classmates, and follow instructions.  R. 365-68.  Andrea even made the honor roll during her last

two semesters of school and was to enter the fifth grade in the fall.  R. 257, 377.  Records from Dr. Adly Thebaud confirm that Claimant did well on her medications beginning in April 2002. R. 325-37.

Substantial evidence exists for the ALJ's finding that Andrea was not limited in the domain of "acquiring and using information."  Therefore, this finding will not be disturbed by the Court.

2.   **Substantial Evidence Supports the ALJ's Decision that Andrea Was Less Than Markedly Limited in the Domain of "Caring for Yourself" and "Health and Physical Well-Being"**

The ALJ found that Andrea had less than marked limitations in the domain of "caring for yourself" and no limitations in the domain of "health and physical well-being."  Evans argues that these findings  are unsupported because of Andrea's two brief hospitalizations at Halifax Medical Center in August 2001 and December 2001.

The regulations pertaining to the domain "caring for yourself" state that school age children–

> [S]hould be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior.  You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv).

Andrea was hospitalized from August 21-28, 2001, because of increasingly violent and aggressive behavior toward her siblings and other family members.  R.  146, 149.  Her identified

problems were depression, mood swings, poor impulse control, poor anger management, and family dysfunction; her assets were good physical health and she was verbal and motivated to seek help.  R. 147.  At the time of her admission, Andrea's GAF score was 40.[5]  Claimant was diagnosed with bipolar affective disorder and a history of ADHD and  was treated with medication and therapy.

Andrea received further treatment at Halifax Medical Center from September 18, 2001, to October 9, 2001.  R. 162-70.  On October 9, 2001, Andrea was given a GAF score of 75.[6]  R. 163.  However, Andrea's condition deteriorated and, on December 3, 2001, she was admitted to the hospital for in-patient treatment.  R. 287-324.  Her medications were adjusted and her condition gradually improved.  Andrea was discharged on December 9, 2001, with a GAF score of 65.[7]  R. 287.

On December 12, 2001, and January 9, 2002, Dr. Thebaud reported Andrea's emotional state was stabilizing as he adjusted her medications.  R. 207-08.  Andrea's medications were adjusted again in March 2002.  R. 340-41.  By April 2002, Andrea's grades and behavior at school were good, her sleep was better, her appetite was okay, and her concentration was improved.  R. 339.  Andrea continued to do well through the doctor's last report in July 2003.  R. 325-37.

_____

[5]  A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school).  *See,* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th ed. 2000) (DSM-IV).

[6]  A GAF score of 71-80 means that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 32 (4th ed. 2000) (DSM-IV).

[7] A GAF score of 61-70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

Additionally, in August 2001, Evans reported that Andrea could use a zipper, and button her clothes without assistance, she could tie shoelaces, brush her teeth, wash her hair, choose her clothes, eat by herself, and get to school on time, although she needed to be monitored to complete these tasks. R. 98. Based on the record as a whole, substantial evidence supports the ALJ's finding that Andrea had a more than slight, but less than marked limitation in the domain of caring for yourself.

With respect to the domain of "health and physical well-being," the regulations provide examples of limitations in health and physical well-being as including:

> (i)     You have generalized symptoms, such as weakness, dizziness, agitation (e.g., excitability), lethargy (e.g., fatigue or loss of energy or stamina), or psychomotor retardation because of your impairment(s).
>
> (ii)    You have somatic complaints related to your impairments (e.g., seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia).
>
> (iii)   You have limitations in your physical functioning because of your treatment (e.g., chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments).
>
> (iv)    You have exacerbations from one impairment or a combination of impairments that interfere with your physical functioning.
>
> (v)     You are medically fragile and need intensive medical care to maintain your level of health and physical well-being.

20 C.F.R. § 416.926a(l)(4).

In this case, there was no evidence that Andrea experienced generalized weakness, psychomotor retardation, limitations in physical functioning, or exacerbations that interfere with her physical functioning as a result of her impairments or that she was medically fragile. Andrea reported having some insomnia in August 2001, but she denied having any gastrointestinal problems, chest pain, palpitations or dyspnea on exertion, muscle weakness, numbness or history of seizures.

-26-

R. 150-51.  Indeed, at the time of both of her hospitalizations, there were no abnormal physical findings.  R. 151-52; 292-93.  In April 2002, after her second hospitalization, Andrea's sleep was better, her appetite was okay, and her concentration was improved.  R. 339.  No additional somatic complaints were reported during subsequent follow-up visits.  R. 325-38.  In July 2003, Dr. Thebaud reported Claimant slept well and her appetite was normal.  R. 325.

There is substantial evidence that Andrea did not experience somatic complaints for a twelve month duration.  Therefore, the ALJ's finding of no limitation in the area of "health and physical well-being" is sustained.

3.    **Any Error by the ALJ's in Failing to Consider Dr. Boger's Evaluation was Harmless**

Evans contends the ALJ ignored the evaluation of a State Agency psychologist, Dr. Boger, who found that Andrea had marked limitations in the area of "attending and completing tasks." R. 220.  Rather than directly addressing this issue, the Commissioner identifies evidence that she argues could support the ALJ's determination that Andrea was less than markedly limited in this domain.  Evans is correct that the ALJ's decision makes no reference to Dr. Boger's evaluation.

Although the ALJ is not bound by the findings made by the State Agency psychological consultant, the ALJ is required to consider the findings as opinion evidence.   20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).  Failure to adhere to the procedures prescribed by the Social Security regulations is grounds for reversal and remand of an administrative decision.  *See McCloud v. Barnhart*, 2006 WL 177576, at *7 (11th Cir. Jan. 25, 2006) (unpublished).

The courts, however, may decline to reverse and remand on procedural grounds when it is clear that the procedural error did not compromise the decision-making process. *Ware v. Schweiker,* 651

-27-

F.2d 408, 414 (5th Cir. 1981)[8] (ALJ's failure to warn Social Security claimant she bore the burden of proof and failure to probe fully the job duties of a nurse's aide were harmless error not requiring remand when there was no showing of prejudice); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tx. 2003) (ALJ's failure to consider expressly the findings of one state agency medical consultant ("SAMC") and to specifically reference and/or discuss the findings of another SAMC in the decision was harmless error); *Wright v. Barnhart*, 153 Fed.Appx. 678, 684 (11th Cir. 2005) (unpublished) (an incorrect application of the Social Security regulations resulted in harmless error because a correct application would not contradict the ALJ's ultimate findings).  It makes little sense to reverse and remand for technical failings that do not influence the outcome.  This principle is especially important in the Social Security context where the sheer volume of cases requires that the courts not further burden the Social Security Administration with the remand of futile claims.  *See Alejandro*, 291 F. Supp. 2d at 515-16 (citing cases).

The basis for Dr. Boger's opinion that Andrea had marked limitations in attending and completing tasks was based on the fact that Andrea only completed 50% of her work.  R. 220. The only evidence in the record supporting Dr. Boger's statement is the evaluation by Andrea's teacher completed on October 15, 2001, after the teacher had known Andrea for three months.  R. 55, 57-58.  While the ALJ's decision did not refer expressly to Dr. Boger's evaluation, he clearly considered the evidence about Andrea's completion of her school work and her ability to stay on task.  R. 19, 21.  It is apparent that the ALJ considered the same evidence evaluated by Dr. Boger, but reached a different conclusion regarding the severity of Andrea's impairment.  Since the ALJ has ultimate responsibility

---

[8] The *Ware* case was decided on July 24, 1981, making it binding precedent pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

to determine whether a claimant is disabled, and the ALJ in this case considered the very same evidence considered by Dr. Boger, the ALJ's failure to refer specifically to Dr. Boger's opinion is harmless error.

Even if the Court were to remand the case for the ALJ's procedural error, the result would not change.  As discussed above, substantial evidence supports the ALJ's decision that Andrea had less than marked limitations in the other domains.  For Andrea to suffer any prejudice from the ALJ's failure to discuss Dr. Boger's evaluation, there would have to be substantial evidence in the record to support a finding that Andrea had an "extreme" limitation in the domain of attending and completing tasks.  20 C.F.R. § 416.926a (d).

According to the regulations, an "extreme" limitation is the rating given to the worst limitations.  20 C.F.R. § 416.926 (e)(3)(i).  The claimant's "day-to-day functioning must be very seriously limited when [her] impairment(s) limits only one activity. . . ."  *Id*.  For children, an "extreme" limitation will be found when children "have a valid score that is three standard deviations or more below the mean on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score."  20 C.F.R. § 416.926 (e)(3)(iii).

The regulations further discuss what is meant by "attending and completing tasks."  School age children should be able to focus attention in a variety of situations in order to follow directions, remember and organize school materials, complete classroom and homework assignments, concentrate on details and not make careless mistakes, change activities or routines without distracting themselves or others, stay on task and in place when appropriate, sustain attention well enough to participate in

group sports, read, complete family chores, and complete a transition task (*e.g.*, be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation. *See* 20 C.F.R. § 416.926a (h)(2)(iv).

There is no substantial evidence, however, that Andrea had an extreme limitation in the domain of attending and completing tasks. The record is devoid of any standardized tests designed to measure Andrea's functioning in this domain. The most severe assessment of Andrea's functioning in this area comes from Dr. Boger, who opined only that Andrea had "marked" limitations. *See, e.g., Alejandro*, 291 F. Supp. 2d at 517 (consideration of opinions by state agency physicians that were not expressly addressed by ALJ were unhelpful to claimant's disability claim, and the ALJ's failure to expressly consider those findings resulted in harmless error). Further, when Andrea takes her medications, she is able to function well, and even to make her school's Honor Roll. A review of the record as a whole reflects an absence of substantial evidence that could support a finding of an "extreme" limitation in this area. The ALJ's failure to consider expressly Dr. Boger's opinion is harmless error, and remand is futile.

## VI.    CONCLUSION

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.

**DONE** and **ORDERED** in Orlando, Florida on February 22, 2006.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL            33602

The Honorable Arthur W. Stacy
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817